May it please the court. I am Lawrence Kay, a member of Herrick Feinstein, the attorneys for the plaintiff appellant Marei Von Saher, who is in the courtroom today. I reserve five minutes for rebuttal. In 2009... Let me just state for the record that we're on Von Saher v. Norton Simon Museum of Art at Pasadena, etc. Thank you, Your Honor. In 2009, this panel ruled that California's special holocaust statute at issue then, section 354.3, was preempted by foreign policy. But it did not find that Mrs. Von Saher's common law claims were preempted. To the contrary, the court remanded the case and directed the district court to determine whether the common law claims were timely under section 338.C.3, the state's general statute of limitations for claims to recover stolen art. As Your Honor's explained, referring to this court's earlier decision in Alperin, our holding that the judiciary has the power to adjudicate holocaust-era property claims does not mean that states have the power to provide legislative remedies for these claims. And so, Your Honor, I would like to ask counsel to comment on this, drawing a clear distinction between common law claims for the recovery of looted holocaust property and attempts by the states to legislate. Well, counsel, may I just interrupt you for a moment and just ask, why shouldn't we conclude that the remedies your client seeks are in direct conflict with Federal policy? We realize when it went on remand, the Solicitor General indicated that the restitution claims stopped, but still were alive. They did it for pragmatic purposes. So why doesn't your client's claim affect Federal policy? I will explain why we believe it does not. In the Solicitor General's brief that the Supreme Court asked him to file when we sought certiorari on the issue of the special holocaust statute, he did say that, in his view, that special statute 354.3 was preempted by Federal foreign policy authorities. But like this Court, he drew a distinction between, at page 10 of his brief, between preemption affecting a special statute, the power of the state to legislate in that field, and the issue of common law claims for the recovery of holocaust-era art. And he said that the policy that he articulated should apply to preempt the statute, but went on to say that the common law claims could be held timely under California's General Statute of Limitations for Stolen Art Section 338C.3. And he noted, in doing that, that there were two court of appeals decisions that have held that in the First and Fifth Circuit, Your Honor, that the application of general state statutes of limitations to claims seeking the recovery of holocaust-era artwork does not impermissibly intrude upon Federal foreign affairs authorities. He thus did not suggest that the common law claims should be dismissed, and to the contrary, he expected those claims to continue, and the district court to determine, pursuant to this Court's direction, whether they were timely under the general state statute of limitations. So both this Court and the Solicitor General drew that distinction between the adjudication of claims, which is a traditional function of the courts, and the legislation in this area, which this Court and the Solicitor General found would be preempted. But did the district court do that? No. To our great surprise, Your Honor, the district court seemed to ignore the directive of this Court and the plain language of the Solicitor General and went on to find the common law claims preempted. We believe that that was error and that the judge, the district court, should have denied the motion to dismiss and proceeded to decide the two issues left in the case. First, are Mrs. von Sacher's claims timely under Section 338? And, if so, who has good title to the chronics, Mrs. von Sacher or the museum? This had failed to do. We submit that this should be the end of the Court's inquiry today, in light of your earlier decision and in light of the Solicitor General's statements, and that the decision below should be reversed, with directions to, on remand, to determine whether the common law claims are timely under the general statute of limitations, and to finally determine who has good title to these pictures. Didn't the Solicitor General's brief, though, argue before the Supreme Court that making such an adjudication would run into direct conflict with our foreign policy? As we read the brief, he, at the beginning of his arguments on 354.3, very carefully, just like this Court did, distinguished between a special statute providing a remedy for Holocaust claims and a general state statute that was addressed to all stolen art claims. And that was his problem, only the special statute. Like this Court, he saw no problem with the adjudication of the common law claim under the general statute of limitations. Well, wouldn't we have to, in inquiring about the restitution proceedings, how can we do it without deciding whether the Dutch restitution proceedings were bona fide? In order to decide that, what are we to do with Mr. Stroganoff's claim that the works were wrongly sold to Mr. Goudsteker? Is it Steiker, Sticker? Anyway, in the first place, why should we presume that the postwar proceedings had no bearing on Mr. Goudsteker's claim? Certainly, Your Honor. When you read the statement of policy in the Solicitor General's brief, which he applied to Section 354.3, which we say should apply to the common law claims, but assuming they do here, he did not say that all art returned to the country of origin pursuant to external restitution would result in a bar of litigation today. What he said was only such objects returned pursuant to external restitution that were followed by bona fide internal restitution proceedings would be barred. We submit that his findings or assumptions of fact as to whether there were bona fide restitution proceedings in the Netherlands after the chronics were returned are assumptions or findings of fact with no record ever having been made by the courts below, none, and that they were his view of the facts without any basis for doing so. But didn't, I'm trying to remember, Desi Goudsteker, didn't she decline to file a claim in the Dutch proceedings for those particular works of art? Exactly, Your Honor, and that's why there was no restitution proceedings. But she did file a claim for a number of other pieces of art, didn't she? Much later, Your Honor. But she got restitution for those. She did, and if the chronics had been in the Netherlands at the time of that decision in 2006, they, too, would have been returned because they were stolen by Goring at the same time. Let me just explain a bit that the court below, unlike the Solicitor General, on a 12B6 motion, is bound by the well-pled allegations of the complaint. All of the so-called facts found by the Solicitor General are refuted by the complaint. Let me say there are four facts which I think Your Honor is thinking about. Number one, there was no, as Your Honor just said, there was no post-war restitution proceeding started by Desi Goudsteker. She decided not to do that because she didn't think she'd get fair treatment. With respect to Adam and Eve. With respect to all the Goring paintings, including the 200 returned to Mrs. von Sacher in 2006. They were on Adam and Eve, right? They were all there at the time. And in the 2006 decision, Your Honor, Mette van der Laan, the State Secretary, in awarding the other 200 pictures to Mrs. von Sacher, said that Mrs. Houtsteker did nothing wrong by electing not to bring a proceeding because the likelihood of her being treated fairly was low. She didn't waive any rights at all. And it was absolutely satisfactory to her, as the restitutions committee that advised her also said, to bring her claim in 2004 for Mrs. von Sacher to bring the claim because there was no prejudice from the failure to bring an earlier restitution proceeding. But the fact is there was no bona fide restitution proceeding. There was no proceeding at all. So. But then let me ask you about that. Why wouldn't resolution of this case implicate the active State doctrine? How do we write an opinion granting your client relief without essentially telling the Dutch government that its most recent efforts 50 years later, albeit, to fix the restitution weren't good enough? Your Honor, you don't have to say that at all. And the reason is, as the amended complaint alleges, as we will demonstrate to the district court on the appropriate fact-finding issue, there were no restitution proceedings of any kind at any time with respect to the chronics. As I said, after the war, there were none. There was no opportunity for restitution proceedings. As the Dutch government today, and it's spread throughout our brief, they say there was no bona fide restitution process. It was unfair, bureaucratic, and callous. Number two, in the 1998 and 2004 proceedings brought by Mrs. von Sacher, the chronics were already in the United States, so they weren't the subject matter of those proceedings. And that was confirmed in a letter by the Dutch government set forth in our briefs to the counsel for both Norton Simon and our client, Dutch counsel, where it said that they were not involved in our proceedings and we see this as a private dispute between two parties that we have no interest in. And with Mr. Stroganoff, contrary to statements that are absolutely made without any basis by the courts and by Norton Simon and by the solicitor general, there was no restitution proceeding ever brought by Mr. Stroganoff. He brought a claim, and a few years later, the Dutch government sold him the chronics, sold him pursuant to a bill of sale. We submit that there is no need for any court in this case to review, challenge, or invalidate any restitution decision of the Dutch government or Dutch courts because there were none. All the district court below has to do in finding the facts is then determine whether the applicable Dutch law applied to the sale by the Dutch government to Mr. Stroganoff transferred any good title to him that he in turn could have transferred to Norton Simon. And we submit, Your Honor, when the district court reviews the appropriate Dutch authority that will be submitted by the appropriate Dutch legal experts, you will find that no transfer of good faith title occurred because of that sale because under Dutch law, the transferee has to believe that the transferor has good title and Mr. Stroganoff on the record did not believe that. There was no transfer of good faith title to Mr. Stroganoff, and that's something for us to establish to the district court below as it ruled on it. My understanding of the facts are that Stroganoff did make a claim in the restitution proceedings. He did not make a restitution. First of all, E-100, which was the postal restitution proceeding, had expired by 1952, so he couldn't make one. Number two, he wasn't claiming that that was only for World War II restitution. He was claiming with no basis whatsoever that his family had owned it and the Bolsheviks had taken it away. That's not true, Your Honor. We can demonstrate to the court below by documentary evidence in the record that it was owned by a church of the Holy Trinity in Kiev, never by the Stroganoff family. And he just filed a claim for purposes, according to our Dutch counsel, of stopping the statute of limitations, but never followed through with the restitution proceeding because there was not one procedurally that he could bring, and then ultimately the Dutch government sold him the paintings pursuant to a bill of sale. There was no restitution proceeding, and in any event, whether there was or there wasn't, is a quintessential finding of fact that the district court would have to make below, and not on a 12b-6 motion where we fled in the complaint that the Stroganoffs never owned it and that there was a sale, not a restitution proceeding. All right. You have very little time left. What is your argument on the statute of limitations? That under the amended statute of limitations, the 338C-3, a claimant can bring an act, the claimant, specifically the claimant, can bring an action within six years after actual, actual discovery of the identity and whereabouts of the objects. Our client, Mrs. von Sacher, learned well within six years of the time she entered into a standstill agreement and then, with the Norton Sumner No. 1 suit, shows she's absolutely timely under the new statute, Your Honor. Not under the old statute. I'm sorry? Not under the old statute, however. No, we would submit also, though it's not, we don't believe, relevant at this point, that if the old statute came in, we were prepared to prove, and this Court remanded for that purpose last time, we were prepared to prove that under the old statute, and Mrs. von Sacher satisfied the due diligence requirements and would have reasonably discovered it within the terms of that statute. There was a Dutch restitution committee, this was in 2004, that recommended granting your client restitution, and the State Secretary then agreed to return 200 pieces, but the two paintings were sold in 1966, so they just weren't available at the time. If they had been in the Netherlands, we submit they would have been returned with the other 200, so that the only issue is when they were sold to Mr. Stroganoff, did he get good title, and we submit that under the applicable Dutch law, he did not, and that's the only inquiry the District Court need make in that regard. So then they, that being the case, then they would, setting aside that sale, then they would have been available to the Dutch government to return to your client. No, they weren't in the Netherlands. By that time they were in the North Sea Museum. No, they were not in the Netherlands. And they only, under the Dutch restitution procedure, they could only deal with works still in the Netherlands. And there's never been, this is all on the pleadings. It's all on the pleadings, Your Honor. We have our first amended complaint after we amended the last one. Not on a motion for summary judgment. A motion to dismiss, Your Honor, under 12B-6. I know, I know that. Not a motion for summary judgment. I know that. That's what I said, not on summary judgment. Right. Yeah. All right. I think you've used up your time. Thank you, Your Honors. But may it please the Court, Fred Rowley, Jr. for the Norton-Simon Appellees. I'd like to pick up on a question that Judge Nelson asked. Those pictures are just right across the street, aren't they, those paintings? Your Honor, they are probably about a half a mile away. Not even that far. Not even that far. Closer, closer. But I'd like to pick up on Judge Nelson's question about the foreign policy here, the Executive Branch's foreign policy, because what we just heard was a direct attack on that policy and a request that this Court second-guess with the United States, and in particular with the State Department and the Department of Justice, has articulated as the Executive Branch's foreign policy on recovered artworks. And I think it's helpful to go back to what the United States said in its brief in this case. And the statement appears on page 19 of the government's invitation brief. And what it says is that when a foreign nation like the Netherlands here has conducted bona fide post-war internal restitution proceedings. Now, isn't that an issue, whether it was bona fide? Well, Your Honor, it is a statement of U.S. policy. The State Department and in particular. How do we know it was bona fide? Because the United States has said so, Your Honor. It's a question of foreign policy. What did the United States say that what went on there was done properly and it was bona fide? Your Honor, it appears on page 19 of the government's invitation brief in this case. What evidence was that based on? Well, Your Honor, that gets to another important point, which is that this court and the Supreme Court and courts all over the country have repeatedly said that it is not an appropriate role for the courts to second-guess the United States' articulation of its own foreign policy. And so. What does that mean, second-guess the United States of its own foreign policy? Well, whereas in this instance, the U.S. has articulated, in particular, the executive branch. And this brief was signed by Harold Koh, legal advisor to the State Department. I know Harold Koh. Yes, Your Honor. Okay. So when the executive branch has articulated what its foreign policy is, the cases say that courts are not to second-guess and pierce that policy by examining, for example, whether it's wise or unwise or whether it's based on misinformation. If you look at Garamendi, the Supreme Court says that directly. The Supreme Court said our business is not to judge the wisdom of the national government's policy. Dissatisfaction should be addressed to the President or perhaps Congress. And what we just heard is a set of challenges to the executive branch's policy, and those are best directed to the executive branch. Because I'll read on. The United States has been quite clear in this case, and I'll start over again. When a foreign nation like the Netherlands here has conducted a bona fide post-war internal restitution proceeding following the return of Nazi co- Now tell me what they did. What procedure was followed? Tell me what it was. The United States in Tell me what the procedure was. Okay. Following World War II, the United States, the executive branch adopted a policy of external restitution, which this court recognized in the first decision in this case. And pursuant to that policy, artworks were to be returned to the country of origin, here the Netherlands. The country of origin was to be responsible for internal restitution. And in the last appeal, we submitted to this court documents that reflected and explained the external restitution policy. And the State Department memo we submitted, for example, shows that the government thought carefully about how to conduct restitution. And what it decided was that countries of origin alone ought to be responsible for individual restitution. The United States did not want to get involved in untangling questions of title, which is, of course, precisely what the plaintiff is asking this court to do. And to follow up with Judge Bragerson's question, when these paintings were returned to the Netherlands, the Dutch government conducted three restitution proceedings for plaintiff and her predecessors. The government explains those in its brief, and the government's conclusion, and I quote, was that the Dutch government has afforded petitioner and her predecessors adequate opportunity to press their claims. Now, what we heard from my friend, Mr. Kaye, is that those policy judgments rest on factual issues, suggesting that these are just facts that are joined in this litigation by the positions of the parties. But they are not facts. They are policy assessments. It is important to note that the internal restitution proceedings conducted by the Dutch government have foreign affairs issues and diplomacy built into their DNA. When the Dutch government adopted and established those internal restitution proceedings, it was carrying out its obligations under the London Declaration, in which the Netherlands and the United States agreed that they would not honor forced transactions and looting conducted by the enemy nations. So these are proceedings that the Dutch government carried out in honor of its international obligations. The United States returned the products. I'm just still asking you, what did the Dutch government do, you know, to show that its conduct was in good faith and that bona fides requirement was satisfied? Your Honor. You're just telling me, well, the State Department turned it all over to them, and then we just have to assume that all this other stuff happened. No, Judge Prager, what I'm saying is that the United States State Department and the executive branch has made that assessment. They have determined that the restitution proceedings conducted by the Dutch government here were bona fide. That's what it says at page 19 of the brief. And what they mean by that is bona fide for purposes of the United States' policies on recovered art. In the government's brief, it explains that there's external restitution. It explains the relationships among external restitution, the Washington Principles, and the Terrorism Declaration. And with those policies in mind, the United States has adjudged the Netherlands' proceedings conducted for the plaintiff and her predecessors bona fide. Now, to highlight that that is not a statement of fact, that that is not a determination of fact in this litigation, that they're bona fide, imagine what would happen if this court were to take up the plaintiff's suggested course. The court would conduct the court would remand and there would be a trial. There would be a trial here on whether the Dutch restitution proceedings were bona fide. And that's crystal clear from the plaintiff's opening brief. Because it states a court or jury's fact finder must be able to review prior proceedings in the country of origin to make a determination as to whether there was a bona fide restitution proceeding there. So you'd have an Article III court making a pronouncement if the plaintiff is right that those proceedings were not bona fide. They were conducted in bad faith. And if that was true, you would have two branches of the United States government taking two diametrically opposing positions. Let's say they were conducted in bad faith as a given. So what do we do then? Your Honor, that is a policy judgment for the United States Executive Branch. And the State Department has already made that assessment. And if the court were to conclude otherwise, you'd have two branches of the Federal Government taking two different positions on a matter of foreign policy. And that is what the framers sought to avoid. Well, why is it a matter of foreign policy? It's a matter of justice, isn't it? What's right? Judge Craigerson? You know, and whose property it was. And, you know, I remember those days. Yes, Your Honor. Yeah. I remember those days. I lived through them. Yes, Your Honor. Yeah. The reason that they're matters of foreign policy go back to those days, Your Honor. The State Department thought carefully about how to handle this matter. How do I know they thought carefully about handling this matter? Your Honor, we submitted to this Court in the last appeal original documents from that era reflecting the United States' policy on external restitution. We submitted the order. The policy was you find out the country of origin. You give it to them. Yes. And let them figure out what to do with it. That's precisely right. That's a wonderful policy, isn't it? That was the policy that was carried out in this case. And the government has stated this is important, that where it's here, the proceedings are bona fide. It has a continuing interest in that post-war policy. That's what the United States has said. And so when Mr. Kaye challenged ñ yes, Your Honor. Excuse me. Just a second. So did the Solicitor General file anything in this appeal? No, Your Honor. So all we have to go on is what was filed in the Supreme Court. Your Honor, you have as far as government position in this litigation. Government position. You're right, Judge Wardlaw. It was a brief file that the invitation of the Supreme Court in the last appeal. But I would submit that in addition to that, and we talk about these other policy source documents in the appeal, but the Washington Principles, the Terrorism Declaration, and the external restitution documents, I would say that those represent the universe of foreign policy statements of the United States that the Court ought to consider. And did you bring a motion for judicial notice of them? Or are they somewhere in the prior record of these proceedings? Or where are all those documents? Your Honor, they were submitted to the district court by way of judicial notice. It was undisputed. Both parties relied upon the government's brief in this case in the district court. Okay. So the Solicitor General at page 22 of his brief. Yes, Your Honor. Seemed to contemplate the possibility that on remand petitioner's action will be deemed timely and that then the common law claims would be adjudicated. Your Honor, what the United States is addressing there is the specific issue that was raised by the plaintiff's petition for a writ of certiorari. The Court's last opinion in this case had to do with a specific statute. Right. Section 354.3. So the question presented to the Supreme Court was whether this Court erred in deeming that statute unconstitutional on foreign affairs preemption grounds. So the United States in its brief to the Supreme Court, its invitation brief, is focusing on that particular issue. Now, it articulated the policy. But it didn't make so it sort of contemplated the possibility that these claims could be adjudicated on the merits. Your Honor, there was no occasion for the United States to weigh in on that. So we don't know what the United States' position is right now, do we? Your Honor. We can't. Your Honor is right that the United States has not weighed in on the following question. Given the clearly stated policy set forth in the government's brief, are these common law claims subject to conflict preemption? But that is certainly no bar to the district court's holding that the policy. No, it's not a bar, but you're relying so heavily on the position of the United States. It would be nice to know what it was. Your Honor, this situation is not that different from the Generali case that we cite in our brief. There, the Second Circuit asked for the United States' views on a set of claims that were seeking relief for Holocaust insurance wrongs. And there, the United States submitted a statement of interest. In that statement of interest, it set out essentially the same policy that was at issue in Garamendi. The United States declined to take a position on whether that policy warranted dismissal of the case. The United States also declined to take a position in that letter on whether there was conflict preemption. It said only, this is our policy. And that really reflects the role of the courts versus the role of the executive. Because it is the executive's obligation to state what the policy is, but it is the court's obligation to find whether there's conflict preemption. So I would submit that as in Generali, asking the government for its views on conflict preemption is not necessary, certainly for this court or the district court, to find conflict preemption. I think what Judge Preyerson is concerned about is who adjudicates whether the restitution proceedings in the Netherlands were bona fide proceedings. Yes, Your Honor. Yes. Who is the proper adjudicator of that? I think that the key question is raised by Judge Wardlaw by the word adjudicate. Because adjudicate presupposes that it's an issue of fact, that it's just an issue of fact in this litigation that can be pled and determined by this court. But we submit that the United States' brief reflects that it is a question of policy and not a question of fact. And just to answer your question, Your Honor's question more fully. So you're really saying we have no business sticking our nose in these cases. Judge Preyerson. We just ought to go home. Judge Preyerson, it is not that. It is. That's what it comes down to. No, it is that this policy is not an appropriate subject matter for the court to review. And think about it this way. The plaintiff still hasn't explained, despite our arguments in our answering brief, what the law would be. If the court were to determine whether the Netherlands restitution proceedings were bona fide or not, what's the law? I mean, because what the United States is saying is that those proceedings are bona fide for purposes of Federal recovered art policy, external restitution, the Washington Principles, the Terrorism Declaration. There aren't legal standards in those policy statements. They're foreign policy statements. And so, for example, the Washington Principles are non-binding. They are moral norms that the United States is committed to. Same with the Terrorism Declaration. External restitution gave guidance to the United States. Let me ask you this. Yes, Your Honor. The Netherlands initially, tell me if I'm wrong about this. Yes. The Netherlands, or right, I'll accept that part, too. The Netherlands initially decided that the Kraniches did not belong to von Sauter's predecessors. The Netherlands, Your Honor, the Netherlands didn't make that determination. I thought they gave Adam and Eve to Stroganoff on that basis. Well, I understood Judge Ferguson to be asking about the 1950s proceedings. But what we know and what is clear from the record is that the Netherlands transferred the works to Commander Stroganoff. And just a footnote here, the plaintiff can't plead around the U.S. policies. But Mr. Kay did suggest that there was no claim for restitution of the Kraniches that was filed by Commander Stroganoff. And I think it's worth going back to the allegations and the complaint, because this is what the plaintiff herself has pled. Stroganoff, quote, claimed the Kraniches from the Dutch authorities, end quote. And then he asserted, quote, the Dutch government had no right, title, or interest to or in them. Now, that is a claim that those paintings are his, that they were not the Dutch government's, that the Dutch government had no business holding on to them, and that he wanted them back. It's a restitution claim. And in the next sentence, you have ---- Did the Netherlands then sell the paintings to Stroganoff? Your Honor, we would say that the word sale is a conclusory legal term here, given the active state implications. But there's no question, nobody disputes that there was a monetary payment for those paintings as part of the transfer. But what plaintiff is arguing is that the transfer of those paintings with the monetary payment is unrelated to this claim that they were his, without an offer to purchase, that they were his and he was entitled to them. And so we think that the district court and the United States drew a fair inference, a reasonable inference from the complaint in concluding that those two were related, that the transfer of the Kraniches after Mr. Stroganoff's claim, that those are two related things and they were in settlement of his claim of restitution, Your Honor. Well, in 2004, there was this Dutch Restitution Committee. Yes, Your Honor. And what did they recommend? So, Your Honor, the Dutch Restitution Committee in 2004 was asked by the State Secretary to advise the State Secretary about plaintiff's restitution claim. In the 2000s, the Dutch government adopted a more moral policy and the plaintiff filed the restitution. Adopted a what? A more moral policy. That was how they termed it. A moral. Precisely. A moral. So we're dealing with morality. Okay. Moral policy. That's right, Your Honor. Okay. Those are the Dutch government's words. As a result of the Eckart Commission. Precisely. All right. So the Eckart Commission establishes this framework. There's a restitution claim filed. State Secretary refers it to the Restitutions Commission. Now, it is important to note that the Restitutions Committee here serves an advisory purpose. That's in Article 2.1 of the decree that establishes it. So it's not binding. It's advisory. The State Secretary is the last word on restitution. And what did the State Secretary conclude in 2006 in the very order returning 206 artworks to the plaintiff? The State Secretary concludes the Dutch Court of Appeals gave a final decision in this case in 1999. And in that 1999 decision, the Dutch Court of Appeals concluded that the 1950s proceedings instituted by Ms. Houtstekker were adequately guaranteed. The Dutch Court of Appeals rejected a human rights challenge to those proceedings. The State Secretary, after the recommendation of the Restitutions Committee, is validating that decision. The State Secretary goes on to say that plaintiff's claim, quote, is a matter of restoration of rights which has been settled. So the claim has actually been settled. Then the State Secretary, she goes on to say that the claim was not included in the current restitution policy. So the claim that was successful that actually resulted in the return of 206 artworks to the plaintiff was not in the more moral restitution policy. It was a pure act of discretion by the Dutch government. So when Mr. Kaye is describing the findings and recommendations of the Restitutions Committee, it is important to note that the actual decision by the Dutch government, the final word on the matter, is the State Secretary's decision following that in which the State Secretary disagrees with a number of findings that have to do with finality of the plaintiff's claims. And that really goes back to an important point that the United States made in its brief, which is the United States has determined that there was adequate process. It's process. In following World War II with external restitution, the United States did not want to get involved in individual claims for restitution. It did not have a stake in individual outcomes. It wanted to ensure that there was adequate process. That's what the United States has already determined here when it says that the Dutch government... Why do you say the United States didn't have a stake in the individual process? No, no. I didn't say that, Your Honor. I said... You talked about morality. Yes. And now we're talking about don't have a stake in the individual process. You know, in individual cases, whether a particular painting was returned to one owner versus another, the State Department was worried that those would raise incredibly complex questions of fact. And the State Department was prescient on this point. It said, for example, that original owners may have received partial payment for property taken from them under duress and the governments in question may wish to make adjustments for this. It was worried about the very problems that were presented by the plaintiff's claim for what is restitution in this case. That is why the United States decided that it should be the country of origin that should figure that out. And what it had a stake in was a process, a restitution process, and the U.S. has deemed those processes in this case to be bona fide. That is a foreign policy judgment that we respectfully submit is not appropriate for judicial review under this court's own precedence and under Garamendi and other decisions that we cite in our brief. So whatever the government did was bona fide per se, huh? Your Honor, it is the pronouncement of the executive branch. And I would note that they did do their homework. They showed their homework here. There is an explanation at length in the brief. This is not a situation where the executive branch has merely said, you should dismiss these cases. What it has said is, here is our foreign policy. Now, it has not taken a position on what the implications of that foreign policy is, but the policy itself is clearly stated. The district court correctly concluded that that policy necessarily carried preemptive force. And indeed, if you marry up the government's policy statement with what this court found in the prior decision in this case, which is that the plaintiff's claim would necessarily involve review of Dutch decisions, the court's own words, a California court would necessarily have to review the restitution decisions made by the Dutch government. That's in direct conflict with the policy that is stated in the United States' invitation brief, reflecting the views of the State Department and a considered judgment as reflected in the U.S.'s explanation of its policies. So whether or not the prior panel issued a remand for a determination of whether the claims were timely under the general statute of limitations, what is your position with respect to that? Well, Your Honor, that really reflects the issue that was presented to the panel before. The plaintiff was invoking that special California statute of limitations. The district court invalidated it on foreign preemption grounds and then deemed the claims untimely under the other statute of limitations. And this court affirmed the field preemption holding but sent it back to permit the plaintiff to replete her claim under the then statute of limitations. So that just reflects the issue that was actually presented to the court. On remand, the plaintiff did file an amended complaint. In the intervening period, of course, there was a new statute of limitations that was adopted while the plaintiff's petition for a writ of certiorari was pending. And so even without the directive that the court be given, I mean, that the plaintiff be given the chance to replete her claims, we would have had to do that because there was a new statute of limitations that was adopted by California at the suggestion of plaintiff's counsel. And so plaintiff was given the chance to amend her complaint. We filed a motion to dismiss. We argued, among other things, that the claim was time barred. And then we argued that the plaintiff's action as a whole, given the United States' articulation of the cognate foreign policy in this case, was subject to conflict preemption, and Judge Walter was correct in ruling that indeed it was. And so Judge Walter did not reach some of our other arguments, including an argument that Judge Wardlaw referenced, that the claim is time barred under the new statute anyway. And I can quickly address that. The court could conceivably affirm on the basis that the new statute of limitations requires that the plaintiff's claim be dismissed because Ms. Hautsticker, and the plaintiff doesn't dispute what her knowledge was at the time of the 1950s, well before the Stroganoff transfer, Ms. Hautsticker certainly knew about the chronics. They were listed in the Black Book, which was in her possession. She certainly knew the whereabouts and identity of those paintings because, of course, they were in the Netherlands, and Ms. Hautsticker went to the Netherlands and sought restitution. Now, she did not file a claim for these works, but she was certainly aware of them. It seems odd that she filed a claim for all the other works but not for those works. Your Honor, I mean, that does raise some disputed facts that the court doesn't need to get into. You know, there's a dispute over the reasons for filing a claim on the Meidel transaction. There were two transactions, but not the Gehring transaction. The Dutch court of appeals, of course, concluded that her decision not to seek the chronics was well-considered and voluntary. But, again, that is not something that the court needs to weigh into. The United States has deemed the process to be bona fide, and that is sufficient for conflict prevention purposes. And it's also for the United States. Let me ask you this. The Dutch government concluded, or tell me whether I'm right or wrong, that the chronics had been voluntarily sold by the Gulsteikers. That's von Saar's, you know, family. Is that right? Your Honor, no. Well, with respect, that the Haussdickers had voluntarily- How about when they left that country- Yes. Those two pieces of art were sold. No, Your Honor, it was a forced transaction. That's what I mean, forced transaction. It was absolutely a forced transaction. And how much did they get for this? Your Honor, I can find the figure and- What does it find? It's in the briefs. You've got all this other information in your mind, you know. You don't know what the- Your Honor, I think the key point from your question is this. The restitution- It's not the key point. The key point is I want to know what they got for the picture. Well, Your Honor, I thought your question earlier was directed to whether the Dutch government had taken the position that it was a voluntary transaction. And in the 1950s proceedings, this is clear from not the most recent State Secretary decision, but the State Secretary decision that was issued in 1998. So this is an earlier State Secretary decision that examines this question and noted that with respect to the Goering transaction, the government did- Why don't you say Goering, then I know what you're talking about. Goering, sure, Your Honor. Skip saying Goering. Goering. Goering, it's Goering. Goering. Bad guy, go ahead. Very bad guy. Yeah. The worst. Yeah. Goering, that the Goering transaction, the position that they took was as a formal matter, they call- I think the State Secretary says pro forma. The pro forma position taken by the Dutch government in the proceedings was that it was voluntary. This is in the nature of pleading. But the Dutch government recognized that this was an involuntary transaction. That was the whole basis of the settlement over the Meidelworks, was that those transactions were involuntary. This is explained by the State Secretary in the 1999 decision. Oh, so has it changed now? There was a shift in their views. Well, there was a new policy that was adopted and- Pro forma. Yeah. There was a new policy that was adopted, but it's important to note, in 2006, the State Secretary stood by the Dutch Court of Appeals decision. She did not counterman that decision. It's critical. And then we get back- Was it- Well, anyway. Okay, anything else? Your Honor, the only other thing I would note is that even apart from the conflict preemption problems here, there would be serious active state concerns if the litigation were allowed to go forward. The district court, while not ruling on active state grounds, adverted to them. And in the Solicitor General's brief, the government also adverted generally to the active state doctrine. It is crystal clear from the briefs- Well, the active state doctrine is kind of a flexible doctrine. It is, Your Honor. Yeah. It is. It's discretionary, but- I have a good opinion on that. You ought to read it. Yes, Your Honor. I'm sure that I have. Back in- Oh, going back now to about 1973. It's an exciting opinion. It's got spitfires and all kinds of piracy and everything else. Let's name a bit. I'll look it up, Your Honor. I'm sure I've read it. Okay. All right. There are no further questions. You'll enjoy it. I will be brief, Your Honors. Let me start by saying that our- What's your best argument? My best argument is that this Court and the Solicitor General both said that whatever the policy of the United States is, it doesn't operate to preempt the common law claims in this case. Only the special Holocaust statute California adopted, and this case should be remanded now. And as this Court said in its remand, contrary to the statement of my adversary, even though they struck down the statute, they did remand so that the common law claims could be decided, whether they were timely or not, and then decided. The Solicitor General said the same thing, and that should finally happen. And what happens if we strike down the statute, the amended statute? The amended- As unconstitutional. That would be a problem, Your Honor. But we firmly believe, having read all the briefs submitted in the Kasserer case that you will hear in a moment, that there is no constitutional infirmity to the amended 338. But what if we disagree? If you disagree, then we have a problem because then we have statutes unconstitutional. But, Your Honors, we, as I said earlier, do believe that under the original statute, that we were originally under alternatively to the special statute when we were last here, that we will be able to prove to this Court- But doesn't she have a particular problem with the fact that this family has known exactly the identity and the whereabouts of the Kraniches for a very long time? No, Your Honor. The family did not know that the Kraniches were here in Pasadena. They knew that the paintings had been retained in the custody of the Dutch government when Desi House Sticker decided not to bring a restitution proceeding because she thought it would be unfair. The Dutch government, as we submit, and we believe it's a matter of Dutch law, never acquired good title to those pictures. They only held them in custody for the true owner. There was no opportunity for Desi House Sticker to bring an action against them. They were holding them in trust, and it was when, in 2002, the Dutch government finally looked back at what had happened after the war and concluded, and it's in our briefs, Your Honor, the Dutch government itself concluded that there was no fair restitution after the war, that it was callous, bureaucratic, and in general, and also with respect to Desi because they had ruled that in post-war restitution that the sale to Goring for a pittance, that's the answer to your question, Your Honor, for a pittance of their true value was voluntary. And I sat, in 2005, I sat in the chambers of the restitution committee in the Hague, and Judge Asher, the chief judge, apologized to Mrs. Monsaho, who was sitting ahead of me, saying, I am sorry that we called that voluntary. It was involuntary. And then when Betty Vanderland, the state secretary, wrote her opinion, giving the 200 works back to her, she said, the restitutions committee concluded that Hood Sticker had suffered involuntary loss of possession since the rights to these works were never waived, and they were not covered by the 52 settlement, and we recommend restitution be granted. I hereby adopt that recommendation. The 2002 Eckert Commission, in drafting these principles, said it was because there was no bona fide restitutional process after the war. The quotes are spread throughout our brief, Your Honor, and secondary commentators. And the fact of the matter is Mr. Rowley stands up here and tells you what the 1999 decision said, the 2006 decision said, and made some mixed statements about them. The fact is the 1999 decision, if you look at it, was a procedural decision. They said Mrs. Monsaho's lawyers can't bring an E-100 proceeding in the year 1998 because it expired in 1952. It was purely procedural. And when Mr. Rowley says they said it was settled, it just means you couldn't do it under that. And that's why they had to do it either under the new Eckert rules or in the plenary power of the state, which is what was done. And the fact of the matter is that it is not a matter, not a matter of policy, as to whether or not internal, bona fide internal restitution followed external restitution. It's in our brief, Your Honor, the United States chose to send it back, but chose also, the Allies chose not to monitor the internal proceedings. In the very famous now portrait of Wally case, which involved Austria, there the United States government brought the claim itself. The picture had been restituted to the wrong, to Austria incorrectly. And the plaintiffs, the heirs of Bonny Giray, got them back. There was no problem with the fact they'd been externally restituted. The problem was after the external restitution, there was no correct restitution process. I've said before, and our briefs explicated, there was never any restitution proceeding, at any time, in any way, with respect to the chronics. Not after the war, nor was there an opportunity for bona fide restitution. Not in the 1998 and 2002 proceedings, Your Honor, because the chronics weren't there. That's the only reason they weren't sought. They had to be physically in Holland under the Eckert rules for them to be subject to that. And there was no damage remedy. And nor with respect to Stroganoff. He never filed a restitution proceeding. He couldn't. He 100, as the 1999 decision said, was finished. There was no proceeding for takings during the Bolshevik era, and there was no taking during the Bolshevik era. And that's why the government decided to sell it back to Mr. Stroganoff. But that is a transaction, and applicable Dutch law has to apply to it. And we submit that under the applicable Dutch law, no good fake title. But there is no need for this court or the district court to review, question, contradict, or invalidate any decision of the Dutch government or Dutch court with respect to the chronics, because there was none. And going back again to policy. The policy is that externally restituted objects would be a bar to litigation if and only if they were followed by bona fide internal restitutions. As I've just explained, again, there were no proceedings, much less bona fide. The Sarai case in our briefs is instructive.  But not how, not the opinion of the executive on the facts of the litigation and as to whether that policy applies. The facts that may have led to the development of the policy may be, but not the facts relevant to the case, the determination of whether a facts of internal restitution, bona fide internal restitution, is for the court.  I suggest that it's later in the case that first we look at timeliness and then eventually the court will look at title. And in doing that, it can determine whether there's any decision to review. And we submit there is not. And on the statute of limitations, I would suggest to the court that that issue wasn't decided by the district court. It's not right for appeal. But that the new statute specifically changed the law and said the claim is the claimant's claim. It's the claimant's knowledge. Not any predecessor in interest. And we, as I say, we submit that if it were under the old statute, we also believe Mrs. von Zayers' claims would be timely. But that has not been dealt with by the court below. And it's not up here for appeal. But we feel strongly. Well, we also, having read the briefs of Mr. Cassera, we believe that they explain very well why the decision in that case below was erroneous. But is that issue before us? Not in this case, Your Honor. Only in the next case. That issue's in your next case today. Indeed. But you're suggesting here the district court did not rule on the timeliness, are we? In my case, in von Zayers' case, the district court did not rule on the statute of limitations. It solely ruled. And my question is, should we then deal with that issue? With the statute of limitations? Yes. I don't – I think that it has to go back to the district court for that, Your Honor. But I also submit, if you want to deal with that, under the new statute, there's no doubt on the face of the statute that Mrs. von Zayers' claim is timely. She learned of the whereabouts of the painting in the Norton Simon Museum well within the six years required by the new statute for actual discovery. So I submit her claim is timely. If I may, if I have one more minute. I just want to say that we also point out in our briefs that at the Washington conference, when it was opened, Mr. Lerman said that the reason for the Washington conference is that very often internal restitution, appropriate restitution, did not follow external restitution, and that's why in 1998 the world got together and said we have to fix that. In this particular case, it's up to the district court at the appropriate time, after the 12 v. 6 application, to determine whether there was bona fide internal restitution,  I would close simply by reminding the court, because I think you know, that Mrs. von Zayers started this case in 2007, seeking to invoke a special statute given to her and other heirs and victims of the Holocaust, and was told by the court that it was preempted. She then went to this court, who agreed it was preempted, but then she followed and went to the Supreme Court to see if she could get a reversal of that decision, and in that court, the solicitor general told the court and her that it need not be reviewed because she still had a constitutional avenue, which was pursuing her common law claims under the general statute of limitations, which this court had already suggested in remanding. She then went back to the district court to follow the directive of this court, to follow the statement of the solicitor general, only two years later to find that the district court said, no, I'm preempting the common law claims too, and I was back here seven years later and really hasn't begun her case yet. I submit that Mrs. von Zayers' time to have her case heard on the merits has come, and I respectfully urge the court to reverse the district court and remand for the proceedings that it suggested to take place years ago to determine the timeliness of her claim and then determine, once and for all, who has a good title to the facts. Thank you very much. Thank you.
judges: Pregerson, Nelson, Wardlaw